**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENN WARRANTY CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>PAMELA EDWARDS,<br><br>    Defendant. | CIVIL ACTION NO. 3:17-CV-01860<br><br>(JUDGE CAPUTO) |

## MEMORANDUM

Presently before this Court are two motions filed by Defendant Pamela Edwards: a Motion to Change Venue (*Doc.* 11), and a Motion to Dismiss Plaintiff's Complaint (*Doc.* 9). This action will not be transferred to another venue–specifically the Eastern District of Virginia–because Defendant has failed to meet her burden to establish that the requested transfer is appropriate under 28 U.S.C. § 1404(a). Counts I, VI, VII, and VIII will not be dismissed because Defendant's objection to the reasonableness of geographic and temporal restrictions contained in a non-compete agreement are not properly assessed upon a motion pursuant to Federal Rule of Civil Procedure 12(b)(6). Additionally, Count III of the Complaint will not be dismissed because the Defend Trade Secrets Act of 2016 provides for a private right of action. Finally, Count VIII will not be dismissed because Plaintiff has properly alleged that Defendant interfered with a prospective contractual relationship. Thus, Defendant's Motions will be denied.

### I. Background

**A.    Factual History**

Penn Warranty Corporation ("Plaintiff") sells warranties for used cars. (Plaintiff's Complaint ("*Compl.*"), at ¶9.) Primarily, Plaintiff sells warranties through used car dealerships who offer such warranties to individual purchasers at the point of sale. (*Compl.*, at ¶10.) While located in Wilkes-Barre, Pennsylvania, Plaintiff sells warranties throughout

a broad geographic region that includes a number of states. (*Compl.*, at ¶¶4, 11.) To facilitate sales, Plaintiff has divided its sales region into a number of "sales territories." (*Compl.*, at ¶12.) Each territory is overseen by an in-house employee responsible for collecting "territory specific information and convincing dealerships within their territory to sell Plaintiff's warranties." (*Id*.)

Plaintiff operates in a competitive industry. In Virginia alone Plaintiff faces competition from at least five companies including: Red Auto, GWC Warranty, AUL Corporation, Preferred Warranties, and Resources Management Group. (*Compl.*, at ¶¶13,49.) While many of Plaintiff's competitors are supported by a slightly different sales strategy, they all transact in the same product: warranties for used cars. (*Compl.*, at ¶¶15, 24.)

Plaintiff's business requires the collection and use of confidential information. Specifically, Plaintiff claims that it collects a wide variety of confidential information regarding its dealership-clients. (*Compl.*, at ¶17.) For example, Plaintiff alleges that it collects data about: (1) the types of cars sold by the dealership; (2) the customers who transact at the dealership; (3) the banks that finance the dealer's customers; and (4) the quality of the dealer's recondition of the used cars. (*Id.*) This data–known as "dealer data"– is then used to determine which dealerships are likely to sell cars with high warranty claim rates. (*Compl.*, at ¶18.) This is important because a dealer's warranty claim rate directly impacts the profitability of the warranties. (*Compl.*, at ¶¶19, 20.) The necessity of this data is illustrated by the fact that Plaintiff acknowledges it takes approximately two years to collect it in a new market, and without it Plaintiff does not make a profit. (*Compl.*, at ¶¶21, 22.) Plaintiff continually updates dealer data. (*Compl.*, at ¶23.)

Recognizing the importance of dealer data, Plaintiff takes a number of steps to secure it. In fact, Plaintiff has taken steps to physically secure this data. The dealer data is

stored in a secure server than can only be accessed with a password. (*Compl.*, at ¶27.) Additionally, employees with the password may only access the data with a computer or cell phone provided by Plaintiff. (*Compl.*, at ¶28.) Most employees do not have access to the complete data set. Instead, Plaintiff limits an employee's access to the data obtained from their assigned territory. (*Compl.*, at ¶27.) These protocols are detailed in Plaintiff's employee handbook. (*Compl.*, at ¶29.)

Plaintiff has also taken steps to secure the data through contract. Every employee with access to the dealer data must enter into a Confidentiality Agreement ("the Agreement") that prohibits them from sharing the data. (*Compl.*, at ¶30.) In relevant part the Agreement states:

> In connection with his/her employment, Employee will have immediate access to Confidential Information (as defined below) and trade secrets of [Plaintiff]. At all times during his/her employment with [Plaintiff] and after termination for any reason, Employee shall treat as confidential, all information related to the business of [Plaintiff], including but not limited to the identity of customers, consultants, suppliers, dealerships and contractors of [Plaintiff], forms pricing strategies, sales reports, and financial and technical data or information related to the services provided by [Plaintiff]. Except as required by law, Employee shall not use any such Confidential Information for his/her own purposes nor disclose or use for any other purpose other than to further the business interests of [Plaintiff], any such confidential information at any time to any person expect authorized personnel of [Plaintiff].

(*Compl.*, at ¶33.) This agreement also imposes restrictions on employees post-employment activities. Specifically, this agreement prevents an employee from working "directly or indirectly . . . in any business entity similar to the type of business of [Plaintiff]" within a two-hundred (200) mile radius of the employee's sales territory for two (2) years following termination. (*Compl.*, at ¶34.) Moreover, the employee is barred from contacting, enticing, and soliciting any of Plaintiff's customers for two (2) years following termination. (*Compl.*, at ¶35.) Again, Plaintiff claims to have developed this policy to protect the critical dealer data.

Defendant Pamela Edwards ("Defendant") was employed by Plaintiff as a Sales

3

Representative on March 31, 2014. (*Compl.*, at ¶31.) Defendant was responsible for a sales territory in northern Virginia, which encompassed fifty-five (55) counties. (*Compl.*, at ¶39.) At times, Defendant was also allowed to make sales in Maryland. (*Id.*) As a sales representative, Defendant had access to Plaintiff's dealer data, and was required to sign the Agreement. (*Compl.*, at ¶32.)

On September 22, 2017 Defendant resigned. (*Compl.*, at ¶54.)

Defendant was employed as an independent contractor for Red Auto and Resources Management Group–two of Plaintiff's competitors–approximately one year *prior* to tendering her resignation to Plaintiff. (*Compl.*, at ¶49.) Stated differently, Plaintiff alleges that Defendant was working for two of its competitors while still serving as its sales representative. In her role as independent contractor, Defendant directed used car dealers to purchases warranties from Plaintiff's competitors. (*Compl.*, at ¶¶50-52.) But, Defendant did not turn all business away from Plaintiff. In fact, Defendant directed "loss leader" sales to Plaintiff. (*Compl.*, at ¶51.) A loss leader sale is one which does not generate a profit for Plaintiff. (*Compl.*, at ¶20.). Defendant was able to identify these sales because of her access to Plaintiff's dealer data.[1]

Immediately following Defendant's resignation, Defendant was named Director of National Sales for Red Auto. (*Compl.*, at ¶55.)

**B.    Procedural History**

On October 11, 2017, Plaintiff filed the instant Complaint against Defendant. (*Doc.

---

[1]   Plaintiff explains that Defendant did not only have access to the dealer data electronically. Defendant had printed a significant amount of dealer data to take to meetings in her territory. (*Compl.*, at ¶45-46.) Upon her resignation this information was never returned. (*Id*.) Additionally, Plaintiff discovered immediately prior to Defendant's resignation that she had been downloading some of the dealer data to her personal computer. (*Compl.*, at ¶47.) To date, the downloaded information has yet to be returned to Plaintiff or destroyed. (*Id.*)

1.) The Complaint contains eight Counts: (1) breach of contract; (2) misappropriation of trade secrets under Pennsylvania law; (3) misappropriation of trade secrets under federal law; (4) breach of fiduciary duty; (5) breach of duty of loyalty; (6) unjust enrichment; (7) tortious interference with existing contractual relationships; and (8) tortious interference with prospective contractual relationships. (*Id.*) Defendant filed a Motion to Dismiss the Complaint on December 11, 2017. (*Doc.* 9.) This Motion has been fully briefed and is ripe for review. (*Docs.* 9-10).

On January 19, 2018, Defendant filed a Motion to Change Venue seeking to have this case transferred to the Eastern District of Virginia. Plaintiff filed its opposition to transfer on January 31, 2018. Accordingly, this motion has also been fully briefed and is ripe for review.

## II. Discussion
### A. Motion to Transfer Venue

(1) <u>Legal Standard</u>

A motion to transfer venue is brought pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). Courts have "broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30-31 (1988))."The burden of establishing the need for transfer . . . rests with the movant," and "the plaintiff's choice of venue should not be disturbed lightly." *Id.* at 879 (quotation and citation omitted). "[U]nless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970)

(quotation and citation omitted). Stated differently, "a transfer is not to be liberally granted." *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 706 (D.Del. 2001) (citing *Shutte*, 431 F.2d at 25).

In considering whether to transfer an action pursuant to § 1404(a), courts are not limited to consideration of the three factors enumerated in the statute. *See Jumara*, 55 F.3d at 879. Rather, courts in this circuit are instructed to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Id.* (citation omitted). Both public and private interest factors are considered in evaluating a transfer under § 1404(a). Private interest factors include: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent that the witnesses may be unavailable for trial in one of the fora; and (6) the location of books and records, again, only to the extent that they may not be available in one of the fora. *Id.* Relevant public interest considerations include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easier, quicker, or less expensive; (3) court congestion; (4) local interest in the controversy; (5) public policies of the fora; and (6) the trial judge's familiarity with the applicable state law in diversity cases. *Id.* at 879-80. Again, unless these factors "strongly favor" the Defendants request, "the plaintiff's choice of forum should prevail." *Shutte*, 431 F.2d at 25.

Before considering the private and public interests of a transfer, the court must determine whether the action "might have been brought" in the proposed transferee district. *See High River Ltd. P'ship v. Mylan Labs., Inc.*, 353 F. Supp. 2d 487, 492 (M.D. Pa. 2005) (citation omitted); *see also E. Roof Sys., Inc. v. Simon Prop. Grp., Inc.*, No. 14-717, 2015 U.S. Dist. LEXIS 18809, 2015 WL 679220, at *2 (M.D. Pa. Feb. 17, 2015) (before the court

analyzes the public and private factors when presented with a motion to transfer venue, the court must first "decide whether the district to which the movant seeks to transfer the case has proper jurisdiction and venue, i.e., could the case have been brought in the transferee district in the first instance.").

        (2)      Proper Venue

As a preliminary matter, there is no question that this action could have originated in the Eastern District of Virginia. Venue is proper when a civil action is brought in: (1) a judicial district where any defendant resides; (2) a judicial district where a substantial part of the events or omissions giving rise to the claim occurred; or (3) a judicial district in which any defendant is subject to the court's personal jurisdiction with respect to the given action. 28 U.S.C. § 1391(b)(1)-(3). Pamela Edwards, the defendant in this action, resides within the Eastern District of Virginia. Thus, venue would have been proper if this action had been filed in the Eastern District of Virginia. *See* 28 U.S.C. § 1391(b)(1).

Because this action could have been filed in the Eastern District of Virginia, I will proceed to balance the private and public interest factors related to the requested transfer.

        (3)      Private Interest Factors

After establishing that this action could have originally been filed in the Eastern District of Virginia, I will weigh the private interest factors as set forth by the Circuit in *Jumara*. Remember these factors are:(1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent that the witnesses may be unavailable for trial in one of the fora; and (6) the location of books and records, again, only to the extent that they may not be available in one of the fora. *Jumara*, 55 F.3d at 879.

I find that the private interest factors weigh against transfer.

7

First, as explained above, Plaintiff's forum choice should not be disturbed lightly. *Intel Corp.*, 167 F. Supp. 2d at 706 (citing *Shutte*, 431 F.2d at 25). Here, Plaintiff filed in the Middle District of Pennsylvania, and Plaintiff opposes Defendant's attempt to have this action transferred to the Eastern District of Virginia. (*See generally*, *Docs.* 1, 12.) Because Plaintiff has clearly articulated that its choice of forum is the Middle District of Pennsylvania, the first *Jumara* factor weighs heavily against transfer. *See Jumara*, 55 F.3d at 879. Second, while Defendant's preference to litigate this case in the Eastern District of Virginia weighs in favor of transfer, I do not provide it equal weight to that of Plaintiff's preference. Remember, a plaintiff is the master of the complaint and wields considerable power in determining how an action is structured. It is for this reason that "a plaintiff's choice of forum should prevail" unless there is an exceptional circumstance compelling transfer. *Shutte*, 431 F.2d at 25.

Third, I must consider where the instant claims arose. *See Jumara*, 55 F.3d at 879. Plaintiff's claims arise out of an Agreement that originated in Pennsylvania. It is not lost on me, however, that significant conduct related to the Agreement occurred in Virginia. For example, Defendant solicited vehicle warranties on behalf of Plaintiff in 55 counties in Virginia and Maryland, not Pennsylvania. Also, Plaintiff's complaints regarding Defendant's post-employment activities stem from Defendant's actions in Virginia, not Pennsylvania. So, while Plaintiff's claims technically arise out of an Agreement formed in Pennsylvania, a substantial amount of the conduct at issued occurred in Virginia. For this reason, I will assign a neutral weight to the third *Jumara* factor. The fourth *Jumara* factor–the convenience of the parties–also serves as a neutral weight in this analysis. While it is undisputed that Defendant would have to travel to Pennsylvania to engage in this litigation, Plaintiff would have to travel to VA if the transfer were granted. The burden would simply

flip. Additionally, neither party has adequately addressed the present financial disparity. *See Jumara*, 55 F.3d at 879.

Next, the fifth *Jumara* factor weighs against transfer. Defendant argues that both parties require testimony from witnesses located in Virginia during both the discovery and trial phases of litigation. While arguing that the "prospect of traveling" to Pennsylvania "will chill the involvement of willing witnesses," Defendant has not specifically stated why they would have to make numerous trips to Pennsylvania. (*Doc.* 11-1, at 4.) Plaintiff correctly notes that any depositions of witnesses located in Virginia could take place in Virginia. This means that the Virginia-based witnesses would only be required to travel to Pennsylvania once, for trial. Additionally, Defendant seems to ignore the fact that there are a number of witnesses from Pennsylvania. For these reasons, I will weigh the fifth factor against transfer.

Finally, the sixth factor requires I consider the location of records relevant to this action. To date, there has been no indication that the records are stored in such a way to prevent digital transmission. Since the documents, even those existing in Virginia, could be easily transmitted to Pennsylvania, I see no reason why the location of the records should weigh in favor of transfer.

On balance, the private interest factors weigh in favor of denying Defendant's transfer request.

    (4) <u>Public Interest Factors</u>

The relevant public interests also weigh against transfer. These factors are: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easier, quicker, or less expensive; (3) court congestion; (4) local interest in the controversy; (5) public policies of the fora; and (6) the trial judge's familiarity with the applicable state law in diversity cases. *Jumara*, 55 F.3d at 879-80

First, there is no question that a judgment could be enforced in both the Middle District of Pennsylvania and the Eastern District of Virginia. Thus, there is no need to transfer this case to ensure a judgment will be enforced. Second, regarding the practical considerations that could make trial easy, expeditious, or inexpensive, I find that transfer has no impact and should receive a neutral weight in this analysis. Third, Defendant has not addressed the issues of court congestion, Pennsylvania or Virginia's interest in the controversy, or the public policies of the fora.[2] As it is Defendant's burden to make such a showing, I will weigh these factors against transfer. Finally, I am familiar with both the applicable state law and more importantly the facts of this case. While I am confident that a Judge sitting on the United States District Court for the Eastern District of Virginia is able to analyze issues of Pennsylvania law, it provides no need for transfer.

There is simply no convincing public interest justification to transfer this action.

### (5) Balancing the *Jumara* Factors

Upon consideration of the *Jumara* factors, Defendant's motion to transfer this litigation to the Eastern District of Virginia will be denied. Put simply, Defendant was not been able to show that the private and public interests outlined in *Jumara* sufficiently outweighed Plaintiff's forum choice to render transfer appropriate. In fact, while many factors weighed against transfer, a majority of the public and private interests were considered neutral in this analysis. In light of these circumstances, I find that transfer is

---

[2] Plaintiff argues that there is a larger caseload in the Eastern District of Virginia, which could lead to a slower resolution of its claims. While I do not find Plaintiff's argument particularly compelling–since Plaintiff neglected to take into consideration the fact that the Eastern District of Virginia has a greater number of District Court Judges–it is critical to remember the Defendant has the burden of showing the appropriateness of the proposed transfer. Stated differently, Defendant has offered no justification for transfer related to the third public interest factor, but Plaintiff has. This is also the case with respect to the fourth and fifth public interest factors.

unwarranted because Defendant has failed to meet its burden of demonstrating that transfer would be appropriate under 28 U.S.C. § 1404(a). *Accord Shutte*, 431 F.2d at 25 ("[U]nless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail."); *Jumara*, 55. F.3d at 879; *Holder v. Suarez*, No. 14-1789, 2015 WL 1345209, at *5 (M.D. Pa. Mar. 25, 2015) (Caputo, J.).

For these reasons, Defendant's Motion will be denied.

### B. Motion to Dismiss

#### (1) Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). "Under the 'notice pleading' standard embodied in Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must come forward with 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (quoting FED. R. CIV. P. 8(a)(2)).

When resolving a Rule 12(b)(6) motion, "a court must consider no more than whether the complaint establishes 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements' of the cause of action." *Trzaska v. L'Oreal USA, Inc.*, 865 F. 3d 155, 162 (3d Cir. 2017) (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016)). In reviewing the sufficiency of a complaint, a court must take three steps: (1) identify the elements of the claim; (2) identify conclusions that are not entitled to the assumption of truth; and (3) assume the veracity of the well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief. *See Connelly*, 809 F.3d at 787 (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).

(2) Counts I, VI, VII, VIII: The Validity of a Non-Competition Agreement

Defendant argues that Counts I, VI, VII, and VIII should be dismissed because they are premised on an unenforceable non-competition agreement ("the Agreement"). Specifically, Defendant alleges that the Agreement is unenforceable for three reasons: (1) the goal of the Agreement was to stifle competition, not protect a legitimate business interest; (2) the geographic scope of the Agreement is overly broad; and (3) the restrictions apply for an unreasonably long period of time. These reasons, however, are not properly addressed upon a motion to dismiss. Unreasonableness of the geographic or temporal scope of a non-compete agreement is an affirmative defense on which Defendant bears the burden of proof. *WellSpan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. Ct. 2005). Further, the Third Circuit has opined that since a reasonableness inquiry is fact-intensive, such inquiry should not be conducted on the pleadings unless unreasonableness is clear from the face of the complaint. *See Victaulic Co. v. Tieman*, 499 F.3d 227, 234-35 (3d Cir. 2007) ("Generally speaking, we will not rely on an affirmative defense . . . to trigger dismissal of a complaint under Rule 12(b)(6). A complaint may be dismissed under Rule 12(b)(6) where an unanswered affirmative defense appears on its face, however."); *see also Aamco Transmissions, Inc. v. Romano*, 42 F. Supp 3d 700, 711 (E.D. Pa. 2014) (refusing to address the enforceability of a non-compete agreement upon motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)); *SKF USA, Inc. v. Okkerse*, 992 F. Supp. 2d 432, 451 (E.D. Pa. 2014) (explaining that an agreement is not facially unenforceable even when it contains no geographic limitation, and such an agreement's validity is not properly assessed upon a motion to dismiss.) Additionally, the "goal" of the agreement can not be assessed to any meaningful degree based solely on the Complaint.

Because I find that the objections raised by Defendant with respect to the agreement are fact-intensive, they are not properly raised through a motion pursuant to Federal Rule of Civil Procedure 12(b)(6). Accordingly, Defendant's Motion to Dismiss Counts I, VI, VII, VIII will be denied.

(3) Count III: the Defend Trade Secrets Act of 2016

12

Next, Defendant claims that Count III of the Complaint must be dismissed because Plaintiff has alleged a violation of a criminal statute, 18 U.S.C. § 1832, that does not contain a private right of action. This argument, however, mis-characterizes Plaintiff's allegations. Plaintiff does not allege that the criminal statute cited by Defendant provides a private right of action. Rather, Plaintiff alleges a violation of "18 U.S.C. § 1832, *et seq.* "–more commonly referred to as Defend Trade Secrets Act of 2016 ("DTSA")–which expressly provides for civil claims. 18 U.S.C. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in or intended for use in, interstate commerce or foreign commerce."). Plaintiff is not alone in styling a civil DTSA claim by reference to "18 U.S.C. § 1832, *et seq.*," a number of district courts have done the same. *See, e.g.*, *Brand Energy & Infrastructure Servs., Inc. v. Irex Contr. Grp.*, No. 16-2499, 2017 WL 1105648, at *1 (E.D. Pa. Mar. 23, 2017) (discussing a civil claim arising under "18 U.S.C. § 1832, *et seq.*"); *Consol. Infrastructure Grp., Inc. v. USIC, LLC*, No. 16-472, 2017 WL , at *1 (D. Neb. May 18, 2017) (same). Therefore, Defendant's claim that Plaintiff failed to plead a DTSA claim because the allegation was styled with as "18 U.S.C. §1832, *et seq.*" is incorrect.

Because Plaintiff has adequately alleged a violation of the DTSA, codified at 18 U.S.C. §1832 *et seq.*, Defendant's Motion to Dismiss will be denied with respect to Count III.

(4) <u>Count VIII: Tortious Interference with Prospective Contractual Relations</u>

Finally, Defendant claims that Count VIII of the Complaint must be dismissed because Plaintiff has failed to properly allege the facts necessary to state a claim.

Under Pennsylvania law, a valid claim of tortious interference requires a Plaintiff prove the following: (1) an existing contractual relation between the claimant and a third party; (2) purposeful action on the part of the defendant intended to harm the existing relationship; (3) the absence of a privilege or justification for doing so; and (4) actual legal damage as a result of defendant's conduct. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998); *see also Thompson Coal Co. v. Pike*

*Coal Co.*, 412 A.2d 466, 471 (Pa. 1979). However, Pennsylvania law distinguishes between claims for interference with existing contractual relations and claims for interference with prospective contractual relations. *Thompson*, 412 A.2d at 470-71. In addition to the elements necessary to establish a claim for tortious interference with current contractual relations, a claim premised on a prospective contractual relationship requires a showing of the existence of such relationship. *See Alvord-Polk, Inc. v. F. Shumacher & Co.*, 37 F.3d 996, 1014 (3d Cir. 1993); *see also Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super Ct. 2003).

A Plaintiff establishes a prospective contractual relationship by alleging facts that could plausibly support the finding that there was a reasonable likelihood that the contemplated contract would have materialized absent the defendant's interference. *See Glenn v. Point Park Coll.*, 272 A.2d 895, 898 (Pa. 1971). Notably, Plaintiff's allegation that there was a prospective contract must be based on something other than an existing contract or relationship. *See Phillips v. Selig*, 959 A.2d 420, 429 (Pa. Super. Ct. 2008). Courts in Pennsylvania have noted that determining whether a prospective contractual relationship exists is "admittedly problematic." *Thompson*, 412 A.2d at 471. Put simply, the problem exists because "anything that is prospective in nature is necessarily uncertain." *Glenn*, 272 A.2d at 898. Thus, a court is not asked to deal in certainties, but with reasonable probabilities. In other words, to properly allege a prospective contractual relationship a Plaintiff is required to allege acts undertaken by the Defendant that would reasonably have obstructed the formation of a new contract or relationship. This requires showing "something less than a contractual right, [but] something more than mere hope." *Thompson*, 412 A.2d at 471 (citing *Glenn*, 272 A.2d at 898-99.)

It is also important to remember that a Complaint must only allege a "plausible" claim, and a motion pursuant to Federal Rule 12(b)(6) is not the proper vehicle to begin testing the adequacy of proof. *See Iqbal*, 556 U.S. at 678.

Count VIII of the Complaint alleges a claim for tortious interference in a prospective contractual relationship. The parties only dispute whether Plaintiff has sufficiently alleged

the existence of a prospective contractual relationship. As summarized by Plaintiff, "Defendant's argument is that . . . Plaintiff must present evidence of 'something more' than the existence of a current contractual relationship to establish a prospective relationship" to survive a motion to dismiss. (*Doc.* 10, at 17.) This is correct, "something more" is required. *See Selig*, 959 A.2d at 428-29; *see also Devon Robotics v. Deviedma*, No. 9-3552, 2009 WL 4362822, at *7-8 (E.D. Pa. Dec. 1, 2009). Further, Defendant claims that Plaintiff has relied on nothing more than a current contractual relationship to support its claim. (*Doc.* 9, Ex. 1 at 8.) Thus, Defendant believes dismissal is warranted. (*Id.*)

Plaintiff argues that it has alleged "something more." Specifically, Plaintiff averred that while Defendant was employed by Plaintiff she directed lucrative business to Plaintiff's competitors. (*Compl.*, ¶¶48-53.) It is therefore plausible to conclude that but for the actions of the Defendant, Plaintiff would have entered into contracts with the third-parties Defendant sent elsewhere. Unlike the Plaintiffs in cases cited by Defendant to support dismissal, here, Plaintiff has alleged something more than "mere hope." Instead, it has alleged pro-active conduct by a former employee to undermine the acquisition of customers in favor of a competitor. (*Id.*)

Because Plaintiff has alleged "something more" than the existence of current contractual relationships to support its belief that Defendant interfered with prospective relationships, Defendants Motion to Dismiss Count VIII of the Complaint will be denied.

### III. Conclusion

For the above stated reasons, Defendant's Motion to Change Venue and Motion to Dismiss will be denied. Defendant will be ordered to Answer the Complaint within twenty-one (21) days of the following order.

An appropriate order follows.

February 20, 2018　　　　　　　　　　　　　　/s/ A. Richard Caputo
Date　　　　　　　　　　　　　　　　　　　　　A. Richard Caputo
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

15